**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RADNOR HOLDINGS CORPORATION, | ) | Case No. 06-10894(PJW) |
| et al., | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**MEMORANDUM OPINION AND ORDER
REGARDING THE OBJECTION OF MICHAEL T. KENNEDY
TO THE FINAL FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
(DOC. # 1993)**

Bruce W. McCullough
Bodell Bovè, LLC
1225 N. King Street
Suite 1000
P.O. Box 397
Wilmington, DE 19899-0397

Gary C. Bender
Forbes Bender Paolino &
Disanti P.C.
205 N. Monroe Street
Media, PA 19063

Attorneys for Michael T. Kennedy

Mark S. Chehi
Jason M. Liberi
Skadden, Arps, Slate,
Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Attorneys for Skadden, Arps,
Slate, Meagher & Flom LLP

Date: June 20, 2013

**WALSH, J**

      This Court having previously authorized the employment of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as counsel to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"); and the Final Fee Application of Skadden, Arps, Slate, Meagher & Flom LLP for Compensation for Services Rendered and Reimbursement of Expenses as Counsel to Debtors for the Period From August 21, 2006 Through and Including September 28, 2012 (the "Final Fee Application") and Michael T. Kennedy ("Kennedy") having filed an objection to the Final Fee Application (the "Kennedy Objection"); and this Court having conducted an evidentiary hearing on the Final Fee Application on May 1 and May 2, 2013; and this Court having fully considered the record before it, the evidence adduced and the arguments of counsel; and upon the entire record of these Chapter 11 cases; and it appearing that the relief requested by the Final Fee Application is warranted.

      This Chapter 11 case commenced in August 2006 and is just now concluding.  The docket sheet shows that there have been 2075 docket entries.  Significant and relevant docket entries are identified below:

| Filing Date | Docket # | Item |
|---|---|---|
| 08/21/2006 | 1 | Chapter 11 Voluntary Petition of Radnor Holdings Corporation |

| 08/21/2006 | 24 | Motion to Approve (I) An Order (A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Scheduling A Hearing To Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof... |
| 08/25/2006 | 96 | Application to Employ Skadden Arps as Bankruptcy Counsel for the Debtors filed by Radnor Holdings Corporation |
| 09/01/2006 | 132 | Application to Employ Wilmer Cutler Pickering Hale and Dorr LLP as Special Investigative Counsel to the Company Acting through the Special Committee of the Board of Directors of Radnor Holdings Corporation Nunc Pro Tunc |
| 09/13/2006 | 169 | Objection to Debtors' Application for Order Under Bankruptcy Code Sections 327(a), 328 and 329 and Bankruptcy Rules 2014 and 2016 Authorizing Employment and Retention of Skadden Arps, Slate, Meagher & Flom LLP...Filed by U.S. Trustee |
| 09/18/2006 | 223 | Declaration in Support Supplement to Declaration of Gregg M. Galardi In Further Support of Debtors' Application...Authorizing Employment and Retention of Skadden, Arps... |
| 09/21/2006 | 246 | Order Authorizing Employment and Retention of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates as Bankruptcy Counsel to the Debtors and Debtors in Possession Nunc Pro Tunc |
| 09/22/2006 | 276 | Order Authorizing Employment and Retention of Wilmer Cutler Pickering Hale and Dorr, LLP As Special Investigative Counsel... |
| 10/18/2006 | 425 | Motion to Allow Order Granting the Committee Standing to Prosecute Actions on Behalf of the Debtors' Estates Against Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC, Special Value |

| | | |
|---|---|---|
| | | Opportunities Fund, LLC and Jose E. Feliciano, and for Related Relief |
| 10/25/2006 | 476 | Notice of Debtors' Objection to Claims of Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC and Special Value Opportunities Funds, LLC |
| 10/30/2006 | 512 | Order Granting Official Committee of Unsecured Creditors Standing to Prosecute Actions on Behalf of the Debtors' Estates Against Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC, Special Value Opportunities Fund, LLC and Jose Feliciano |
| 10/31/2006 | 526 | Adversary case 06-50909.  Complaint by the Official Committee of Unsecured Creditors of Radnor Holdings Corporation, et al. against Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC, Special Value Opportunities Fund, LLC, Jose E. Feliciano |
| 11/21/2006 | 698 | Order (WITH REVISIONS)(1) Approving Sale of Substantially all of Debtors' Assets Free and Clear of all Liens, Claims, Interests and Encumbrances |
| 02/21/2008 | 1246 | First Amended Chapter 11 Plan Filed |
| 09/10/2012 | 1976 | Findings of Fact, Conclusions of Law and Order Confirming Modified Second Amended Joint Plan of Liquidation of Radnor Holdings Corporation and Its Affiliated Debtors and Debtors in Possession |
| 12/26/2012 | 1993 | Motion for an Order Setting Aside the November 21, 2006 Sale Order Objecting to Skadden Fee Application (Filed by Kennedy) |

1.   On August 25, 2006, Debtors as debtors-in possession applied to the Court (the "Skadden Retention Application")(Doc. #

5

96) for an order authorizing Debtors to retain Skadden as their bankruptcy counsel, effective as of the petition date, pursuant to an engagement agreement dated July 5, 2006 (the "Engagement Agreement").

2.    The Skadden Retention Application was authorized and filed by Debtors. <u>See</u> Action by Written Consent of the Board of Directors of Radnor Holdings Corporation dated August 21, 2006, annexed to Radnor's chapter 11 petition (Doc. # 1).

3.    In support of the Skadden Retention Application, Skadden filed three disclosure declarations: (i) Declaration of Gregg M. Galardi In Support Of Debtors' Application For Order Under Bankruptcy Code Sections 327(a), 328, and 329 and Bankruptcy Rules 2014 And 2016 Authorizing Employment and Retention of Skadden, Arps, Slate, Meagher & Flom LLP And Affiliates As Bankruptcy Counsel To The Debtors and Debtors In Possession Nun c Pro Tunc To The Petition Date, dated August 29, 2006 (the "Galardi August 2006 Declaration")(Doc. # 96); (ii) Supplement To Declaration of Gregg M. Galardi In Further Support Of Debtors' Application For Order Under Bankruptcy Code Sections 327(a), 328, and 329 and Bankruptcy Rules 2014 And 2016 Authorizing Employment and Retention Of Skadden, Arps, Slate, Meagher & Flom LLP And Affiliates As Bankruptcy Counsel To The Debtors and Debtors In Possession Nunc Pro Tunc To The Petition Date, dated September 18, 2006 (the "Galardi September 2006 Supplemental Declaration")(Doc. # 223); and

(iii) Second Supplement to Declaration of Gregg M. Galardi in Further Support of Debtors' Application for Order under Bankruptcy Code Sections 327(a), 328, and 329 and Bankruptcy Rules 2014 and 2016 Authorizing Employment and Retention of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates as Bankruptcy Counsel to the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date, dated December 19, 2007 (the "Galardi December 2007 Supplemental Declaration")(Doc. # 1222).

4.    On September 13, 2006, the Office of the United States Trustee ("UST") objected to the Skadden Retention Application (the "UST Objection")(Doc. # 169).  Skadden did not block or hinder the UST from investigating and objecting to Debtors' retention of Skadden as their bankruptcy counsel.  Galardi disclosed information to the UST about a Skadden partner's connections to Tennenbaum Capital Partners LLC and related entities ("Tennenbaum").  9/20/06 Hearing Tr. At 36-37.

5.    Prior to and at the September 20, 2006 hearing on Skadden's retention as bankruptcy counsel, then Skadden partner Gregg M. Galardi disclosed in two declarations and in open court the following (collectively, the "Pre-Retention Disclosures"):

- "Skadden, Arps currently represents, or has represented, Tennenbaum on matters unrelated to the Debtors.  In addition, Skadden, Arps has determined that in September and October of 2005, Skadden, Arps attorney provided tax advice to Tennenbaum in connection with the structure of its potential investment in Radnor.  The Skadden, Arps attorney billed less than the aggregate amount of 5.0 hours

to the matter, and prior to taking on the restructuring engagement, Skadden, Arps obtained a full waiver from Tennenbaum." (Galardi August 2006 Declaration ¶ 19).

- "During the twelve-month period ending June 30, 2006 (the "trailing Twelve Months"), the value of the time billed to Tennenbaum matters accounted for only approximately .027% of the value of the time billed to all client matters for the Firm." (Galardi August 2006 Declaration ¶ 19 n. 4); see also 9/20/06 Hearing Tr. at 33,60-61.

- "Richard T. Prins, Esquire, a partner at Skadden, Arps, is the primary engagement partner on matters for Tennenbaum ... Skadden, Arps' work on behalf of Tennenbaum consists generally of representation Tennenbaum in its capacity as a registered investment adviser, and occasionally on corporate matters.... Any work that Skadden, Arps does for the investment funds of Tennenbaum & Co., ...consists primarily of three types of representations. First, ...assists such funds in their formation and in raising capital.... Second, ...appears on behalf of such funds before the United States Securities and Exchange Commission...in connection with the various regulatory and reporting requirements of such funds. Third,...represents such funds on day to day corporate matters." (Galardi September 2006 Supplemental Declaration ¶¶ 5-9).

- "Occasionally in connection with fund work, Tennenbaum requests Skadden, Arps to provide tax planning advice or SEC regulatory advice about potential investments. Often this is on a no names hypothetical basis. As set forth in the Initial Declaration, in September and October of 2005, a Skadden, Arps tax lawyer provided 5 hours of tax structuring advice to Tennenbaum regarding the tax structure of a security, which turned out to be the security the funds acquired in Radnor." (Id.).

- Five hours of tax work was performed by Skadden, Arps for Tennenbaum regarding Radnor. (9/20/06 Hearing Tr. at 34).

- Certain Skadden partners invested in Tennenbaum affiliated funds, over which they had no investment authority. (Id. at 37).

6.   Each of these Pre-Retention Disclosures was made openly, publicly and to this Court prior to this Court's approval and authorization of Skadden's retention.

7.   At the final fee hearing, Galardi testified that the pre-retention disclosures he made -- which were discussed with Radnor's general counsel, Carrie Williamson, in the presence of Kennedy (see 5/1/13 Hearing Tr. at 74) -- disclosed all information that was known to Galardi at the time, and that each of his disclosures was "full and accurate." See 5/1/13 Hearing Tr. at 87.

8.   After a contested evidentiary hearing on September 20, 2006 on the Skadden Retention Application, during which Skadden's connections with Tennenbaum were explored and evaluated, this Court overruled the UST objection and entered an order (the "Retention Order")(Doc. # 246) authorizing Debtors to employ Skadden as their counsel effective as of the petition date pursuant to the terms of the Engagement Agreement. See generally Transcript of September 20, 2006 Hearing (Doc. # 298).

9.   In the trailing twelve months before the date of the bankruptcy filing, Tennenbaum and its affiliates represented .027% of Skadden's revenues. See Skadden Exhibit 1 (5/1/13 Hearing Exhibits); 5/1/13 Hearing Tr. at 86-87. The Court ruled at the time of the Skadden retention hearing, and re-affirms now, that

this is not a material percentage.  See 5/1/13 Hearing Tr. at 86. That percentage is not a disabling conflict and does not support any of Kennedy's allegations.

10.  Based on evidence of the percentage of billable hours, percentage of revenues and nature of legal work Skadden had performed for Tennenbaum, and after argument from the UST and Skadden at the September 20, 2006 evidentiary hearing on the Skadden Retention Application, the Court concluded that Tennenbaum was not a significant client of Skadden, that Skadden's revenue derived from Tennenbaum was not significant, that the Skadden-Tennenbaum relationships presented no improprieties, and that the Court was "not concerned that Skadden Arps may be influenced in any fashion to not engage in the best representation of the debtor." 9/20/06 Hearing Tr. at 60-62.

11.  Given the full record of Skadden disclosures, Skadden did not misrepresent its relationships with Tennenbaum to the Court or the UST.  Skadden's numerous disclosures in these Chapter 11 cases (including the Galardi declarations and Skadden's statements at the September 20, 2006 hearing) were extensive, publicly filed, made on the record, and available to any member of the public, including Kennedy.  Issues regarding Skadden's retention and connections to Tennenbaum were also addressed before the Court at the October 27, 2006 hearing on the Committee's Standing Motion.  See Transcript of October 27, 2006 Hearing (Doc. # 582).  Williamson, Radnor's then

general counsel, attended both the September 20, 2006 and October 27, 2006 hearings.  Id. at p. 68.

12.  Skadden's pre-existing attorney client relationship with Tennenbaum was disclosed and known to Kennedy, Debtors, their general counsel and their directors when Skadden was retained prepetition by Debtors and as their chapter 11 counsel upon the commencement of these Chapter 11 cases.  Skadden's Engagement Agreement discloses Skadden's ongoing representation of Tennenbaum and its affiliates, and provides for the waiver of any conflicts arising out of that representation. Williamson, Debtors' general counsel, was involved throughout Debtors' process of selecting counsel, and was present in the courtroom at the September 20, 2006 hearing on Skadden's retention.

13.  Galardi had frequent interactions with Kennedy.  From the time of Skadden's engagement through at least the date of the sale of Radnor's assets.  Galardi "had, if not daily, very, very regular dealings with Kennedy, his counsel, [and] other members of the board of directors."  5/1/13 Hearing Tr. at 39.

14.  At the very first board meeting in which Galardi and Mr. Pohl were pitching to be retained as restructuring counsel, they disclosed that Tennenbaum was a client of Skadden and that Skadden would require a conflicts waiver to take an adverse position to Tennenbaum.  5/1/13 Hearing Tr. at 42.  Two Tennenbaum individuals -- Jose Feliciano and David Hollander, Tennenbaum's general counsel

-- attended the meeting.  Id. at 40-41.  Galardi told them, and all other attendees, that there could later develop circumstances where Skadden, in representing Radnor, would be required to be adverse to Tennenbaum.   Id. at 43.   Radnor board members and Williamson, Radnor's general counsel, were present when (in person or on the telephone) these remarks were made.   Id. at 43-44; cf. 5/1/13 Hearing Tr. at 72.

15.  Following the meeting, Galardi worked with Skadden partner Patricia Moran to draft an engagement letter which disclosed the Tennenbaum relationship.  5/1/13 Hearing Tr. at 44. After Galardi went over its contents with Radnor's general counsel, the engagement letter was signed by Kennedy.  See Skadden Exhibit 5 (5/2/13 Hearing Exhibits); 5/1/13 Hearing Tr. at 78, 80.   The letter disclosed Skadden's 'on-going representation of Tennenbaum Capital Partners LLC and its affiliates."  Skadden Exhibit 5 at p. 6 (5/2/13 Hearing Exhibits); 5/1/13 Hearing Tr. at 79.

16.  Kennedy's allegation that "Skadden was selected to represent the Debtors by Tennenbaum" has no basis in fact.  5/1/13 Hearing Tr. at 51.   Skadden was chosen and retained by Radnor. Kennedy signed Skadden's retention letter. Id.  Tennenbaum did not control Debtors' affairs, and no one at Tennenbaum ever exercised control over the Radnor board of directors.   353 B.R. at pp. 834-

35.[1]  Whatever influence Tennenbaum exerted on the directions of Debtors was indirect, arising from the covenants and other provisions Tennenbaum contracted for in its credit agreement with Debtors.  Id. at 847.

17.  Kennedy's allegations that "the Radnor board was steered throughout the retention process by Skadden and Tennenbaum" has no basis in fact.  5/1/13 Hearing Tr. at 51-52.  Skadden did not participate in the board meeting where the subject of retention was considered and decided upon.  Tennenbaum, in turn, had only one vote out of four.  Id. Cf. 353 B.R. at 834-35 ("TCP appointed one board member out of a total of four, and it did not control Debtors' affairs...Mr. Kennedy, as majority shareholder and CEO, controlled of Radnor at all times.").

18.  The documentary evidence and testimony demonstrates that Feliciano of Tennenbaum did not insist on hiring Skadden.  Rather, he requested that other firms, in addition to Skadden and Duane Morris, be interviewed.  See Ex. D to Appendix of Kennedy's Objection to Final Fee Application (5/2/13 Hearing Exhibits); 5/2/13 Hearing Tr. at 50.  Feliciano further disclosed that he had "plenty of dealings with Skadden" and that he believed that Skadden's rates were too high for this assignment.  See Ex. D to

---

[1] References to "353 B.R. at ___" are citations to the Court's November 17, 2006 Amended Findings of Fact and Conclusions of Law in The Official Comm. Of Unsecured Creditors of Radnor Holdings Corp. V. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.) Adv. Pro. No. 06-50909, 353 B.R. 820 (Bankr. D. Del. 2006).

Appendix of Kennedy's Objection to Final Fee Application (5/2/13 Hearing Exhibits); 5/2/13 Hearing Tr. at 47.  In short, as Kennedy was forced to concede at the hearing, Feliciano did not insist that Radnor hire Skadden, but rather requested that Radnor interview additional firms besides Skadden and Duane Morris.  Id. at 50. This was because Tennenbaum, and Feliciano and Hollander, actively opposed the hiring of Skadden.

19.  Williamson, Radnor's general counsel, also was actively involved in the retention application process.  5/1/13 Hearing Tr. at 72.  She received multiple drafts of the Skadden retention application and the Galardi declarations and attended the September 20, 2006 retention hearing in this Court.  Id. at 74.

20.  The Skadden retention application, and the UST's objection to it, were discussed during board calls before and after every hearing where these matters were scheduled.  See 5/1/13 Hearing Tr. at 135-36.  Kennedy, as well as Williamson, attended all of these board calls.  Id. at 74-75, 81-82.  They asked Galardi if the UST's objection was well founded and if Skadden would be disqualified.  Galardi told them that he believed that the objection was not well founded, that he would be making supplemental disclosures and the substance of the supplemental disclosures.  Id. at 81-82.  Kennedy participated in those board calls.  Id. at 92.  Williamson did as well, and specifically asked what information would need to be contained in the supplemental

disclosure.  Id. at 134.  Galardi provided that information to Williamson and the board.  Id. at 135-36.  The supplemental information included the fact that certain Skadden partners invested in Tennenbaum funds.  Id. at 136.  Williamson also attended the court hearings concerning the UST's objection.  Id. at 82.  So did Springel, Tennenbaum's CRO.  Id.

21.  The Court gives no weight to Kennedy's testimony that he asked Feliciano if Tennenbaum had any connections to Skadden and Feliciano provided no response.  5/2/13 Hearing Tr. at 38-39. Given Kennedy's testimony that if he knew more of Skadden's alleged conflicts he would not have voted to hire Skadden (e.g., id. at 27), the Court finds that Kennedy lacks credibility in saying he asked a question, received no answer, and did not follow up.

22.  At the objection hearing Kennedy testified repeatedly that he was not aware that Skadden Arps did any work for Tennenbaum other than 5 hours of tax advice.  In cross-examination, Kennedy testified as follows:

> Q    I think it was, and is it your testimony that at the end of May 2006 before Skadden was actually retained by the board you understood only that Skadden had provided, you know, several hours of tax-related advice to Tennenbaum that was related to Radnor?
>
> A    That's what I was told.
>
> Q    Okay.  But didn't you understand before Skadden was retained that Skadden had represented TCP in other unrelated matters?
>
> A    I have no knowledge of that.

(5/2/13 Hearing Tr. at 43).

Aside from being in conflict with the Galardi's testimony as noted above, there are two reasons why Kennedy's position is not believable.  One, it is inconsistent with his subsequent testimony. Specifically:

> Q   In May, at the end of May, when Mr. Kennedy
>      testified he wasn't aware of any of these things.
>
> A   The first time – – to clarify, the first time I was
>     notified of any conflicts at all, <u>including</u> the five
>     hours of tax work, was when Patricia Moran contacted my
>     counsel and told me that we were going to need a waiver,
>     and we had already, you know, begun work. (Emphasis
>     added.)

(5/2/13 Hearing Tr. at 43-44).

Two, it is belied by the fact that Kennedy sent an e-mail to Feliciano on May 30, 2006 in which he stated:

> I understand that Skadden has represented TCP in other
> <u>unrelated matters</u> in the past and Skadden does not
> consider them a conflict, however I want to make certain
> that you would not have a problem with Skadden
> representing the company if the board chooses them during
> our process.  Please confirm via email so I can reaffirm
> with Skadden and the other board members before our
> meeting tomorrow. (Emphasis added.)

(Ex. D, p. 13).

That e-mail was sent before the board voted on the retention of Skadden.  (5/2/13 Hearing Tr. at 46.)

   23.  Skadden did not agree that it would not litigate against Tennenbaum.  Instead, Skadden secured from Tennenbaum a full waiver of any conflicts posed by Skadden's representation of Debtors that would allow Skadden to be adverse to Tennenbaum and its affiliates,

including in any bankruptcy proceeding.  See Skadden Exhibit 4 (5/2/13 Hearing Exhibits): 5/1/13 Hearing Tr. at 54.  Kennedy's allegation that there was a "tacit understanding between Tennenbaum and Skadden that Skadden would not litigate claims against Tennenbaum" is without basis in fact.  Id. at 57.  The purpose of the waiver was to do exactly the opposite.  Id.

24.  Skadden did not shield or attempt to shield Tennenbaum parties from litigation.  Rather, Skadden recommended that Radnor's board form a special committee of independent directors, with separate counsel, to investigate Tennenbaum.  See 5/1/13 Hearing Tr. at 57; see also 9/20/06 Hearing Tr. at p. 12; 10/27/06 Hearing Tr. at p. 54.  Debtors followed Skadden's advice and with the approval of the Court the special committee engaged the Wilmer Cutler Pickering Hale and Dorr LLP law firm, which investigated Tennenbaum and its conduct, claims and liens.  See 5/1/13 Hearing Tr. at 63; see also Doc. Nos. 132 (application to retain Wilmer Cutler Pickering Hale and Dorr LLP) and 276 (order authorizing retention of Wilmer Cutler Pickering Hale and Dorr LLP).  The special committee, comprised of independent director Paul Finnegan, investigated claims and causes of action against, and the liens securing, Tennenbaum's claims.  5/1/13 Hearing Tr. at 62.  The special committee's charge was broad: to "look at all things Tennenbaum-related."  Id. at 63.

25.  In his objection to the Skadden fee application (Doc. #
1993) Kennedy asserts that there was a cozy relationship between
Tennenbaum and Skadden.  His objection contains numerous assertions
in broad generalities but is devoid of specific facts supporting
his position.  For example, in paragraph 6 of the objection,
Kennedy asserts:

> Debtors' counsel, and possibly other professional
> advisers to the Debtors, owed a duty of candor to this
> Honorable Court, the Debtors and its board of directors,
> Mr. Kennedy, as well as other creditors in this case.
> Debtors' counsel breached those duties, in violation of
> the Bankruptcy Code, applicable Delaware law, the Model
> Code of Professional Conduct and possibly under the
> Securities and Exchange Acts of 1934 and the Investment
> Advisors Act of 1940.

(Doc. # 1993, p. 4).

On October 25, 2006 Debtors filed an objection to the claims of
Tennenbaum. (Doc. # 476) The objection was filed by Wilmer Cutler
Pickering Hale and Dorr LLP as counsel for the Special Committee of
the Board of Directors of Radnor Holdings Corporation and by
Skadden as counsel for Debtors.  The introduction of the objection,
Debtors asserted:

> [W]hile reserving the right to further amend this
> objection: (i) the Debtors object to the $23.5 million
> portion of the Tennenbaum Claim based on the Tranche C
> Loan (defined below) to the extent it is more properly
> characterized as an equity interest than as a "claim";
> (ii) the Debtors object to the same portion of the
> Tennenbaum Claim -- relating to the Tranche C Loan -- to
> the extent the Tranche C loan is secured by liens which
> are avoidable pursuant to section 547(b) of the
> Bankruptcy Code; and (iii) the Debtors object to entire
> Tennenbaum Claim -- including to allowance of the Tranche
> A and B Loans (defined herein) to the extent Tennenbaum

> received a preferential transfer on account of those
> Tranche A and B Loans, in accordance with section 502(d)
> of the Bankruptcy Code. The Debtors reserve the right to
> amend this objection on any other grounds (including to
> pursue equitable subordination theories) and to file
> appropriate adversary proceedings to effectuate the
> relief sought herein.

(Doc. # 476, p. 6).

This hardly sounds like Skadden had a cosy relationship with Tennenbaum.

26. Skadden did not act simultaneously as counsel for Debtors and Tennenbaum in connection with these Chapter 11 cases. Tennenbaum was not directly or indirectly represented in the Chapter 11 cases by Skadden. Tennenbaum was separately represented by its own counsel, Milbank Tweed and Richards Layton. Debtors, each secured lender and Kennedy all had separate counsel. 5/1/13 Hearing Tr. at 88-89. Kennedy asked Skadden to provide him with a list of possible lawyers to retain for himself, and Skadden did so. Id. at 90.

27. Tennenbaum was not shielded from litigation. The official committee of unsecured creditors appointed in these cases (the "Committee") was granted standing and commenced an adversary proceeding asserting numerous claims and causes of action against Tennenbaum and others. See Adv. Pro. No. 06-50909. Coincident with the sale process, and with Court approval, the Committee commenced intensive adversary proceeding litigation and discovery against Tennenbaum by filing an adversary complaint. The 60 page

complaint alleged the following causes of action against Tennenbaum and Feliciano, among others:

- recharacterization of Tennenbaum's tranche A and B investments;

- recharacterization of the Tennenbaum's tranche C investment;

- equitable subordination of Tennenbaum's tranche A and B investments;

- equitable subordination of Tennenbaum's tranche C investment;

- Tennenbaum's breach of fiduciary duty of care;

- Tennenbaum's breach of fiduciary duty of loyalty;

- Feliciano's breach of fiduciary duty of care;

- Feliciano's breach of fiduciary duty of loyalty;

- Tennenbaum's aiding and abetting breaches of Radnor officers' and directors' breaches of fiduciary duty of care;

- Tennenbaum's aiding and abetting breaches of Radnor's officers' and directors' breaches of fiduciary duty of loyalty;

- avoidance of fraudulent transfers received by Tennenbaum under 11 U.S.C. § 548(a)(1);

- avoidance of fraudulent transfers received by Tennenbaum under 11 U.S.C. § 544;

- disallowance of the Tennenbaum proofs of claim;

- avoidance of Tennenbaum's liens; avoidance of preferential transfers received by Tennenbaum under 11 U.S.C. § 547(b) and

- turnover of avoided transfers received by Tennenbaum.

The Committee's lawyers had four lawyers in attendance at each of the 8 days of the trial. The legal bill for the Committee in that endeavor amounted to approximately $2 million. On November 16, 2006, the Court entered a lengthy opinion and a judgment against the Committee. The Court ruled against the Committee on each of its asserted causes of action, if such causes of action against Tennenbaum were not withdrawn by the Committee prior to the Court's ruling. The Official Comm. Of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.), 353 B.R. 820 (Bankr. D. Del. 2006), 838, 840, 842, 843, 844-45, 845-46, 846-47, 848-49. The Committee appealed the judgment, but later voluntarily dismissed its appeal.

28. Neither the conduct of Skadden nor Tennenbaum caused Debtors' bankruptcy cases. See 853 B.R. at 835 (transactions between Debtors and Tennenbaum did not cause Debtors' bankruptcy cases). These Chapter 11 cases were the result of Debtors' severe liquidity constraints caused by operational shortfalls, natural disasters and defaults under Debtors' prepetition credit

agreements.  See 353 B.R. at 834-36; Sale Order (Doc. # 698) at p. 6.

29.  Following Skadden's retention in early June 2006 through mid-July 2006, Radnor explored a full restructuring rather than a sale.  5/1/13 Hearing Tr. at 48.  Skadden did not "undermine" these efforts, as Kennedy charges.  Rather, one of the first efforts Skadden undertook when it was retained was to assist in the hiring of an investment banker to "come up with a business plan to shop with financing sources."  Id. at 64.  The investment banker was Mark Shapiro of Lehman Brothers.  Id.

30.  Any attempt by Kennedy to argue that Skadden orchestrated a conspiracy by steering Radnor to hire Lehman Bros. as a financial advisor because Lehman would be partial to Tennenbaum is belied by the record.  Until Lehman's retention application was filed, Galardi had no knowledge of any past relationship between Lehman and Tennenbaum.  5/1/13 Hearing Tr. at 140.

31.  By the end of the second week of July 2006, Radnor had experienced a liquidity crisis and the restructuring preferred by Kennedy had not proceeded.  5/1/13 Hearing Tr. at 48-49.  Feliciano of Tennenbaum resigned from the board during this time period.  Id. at 49.  After that resignation, the board held a meeting and determined to explore a sale as "a backup plan in case the restructuring didn't happen.  Id.

32.   Pursuing a sale was not dictated by Tennenbaum.  Indeed, Tennenbaum did not want to make an unsolicited offer to purchase Radnor's operating business.   It was not until Galardi wrote a letter requesting an offer that Tennenbaum made a term sheet offer. 5/1/13 Hearing Tr. at 49.  Even then, Tennenbaum was a "reluctant offerer."  Id. at 69.  Accord 353 B.R. at 835.

33.   Skadden  negotiated  strongly  against  Tennenbaum  with respect to the bid procedures.  5/1/13 Hearing Tr. at 66.  Galardi referred  to  this  as  not  only  "arm's  length  [but]  swords  length" negotiations.   Id. at 69.   The  negotiations  were  frequently contentious.  Id. at 96.  This is consistent with testimony from Springel  that  the  Court  credited  at  the  2006  trial;  he characterized the negotiations as "spirited and arms length."  353 B.R. at 836.  Topics of the contentious negotiations included the stalking  horse  bid  amount  and  the  length  of  the  sale  process. 5/1/13 Hearing Tr. at 49, 69.  Indeed, Tennenbaum's counsel, from the Milbank Tweed law firm, thought that the UST's position that Skadden could not adequately represent Radnor against Tennenbaum was  "a  little  bit  humorous  because  of  the  history  of  the negotiations...and the way in which [Galardi] negotiated adverse to Tennenbaum."  Id. at 145.  Skadden  also  negotiated  to  cause Tennenbaum to assume liabilities and to pay administrative expenses so the estate would not be administratively insolvent.  Id. at 66, 70.  The negotiations continued during the bid procedures stage,

and "any time [Skadden] had the opportunity to increase the purchase price, [it] did so." Id. at 70; cf. id. at 96.

34. Galardi had three or four negotiating sessions where he attempted to get Tennenbaum to credit bid Tranche C of its debt, which would have benefitted Kennedy, who had given a personal guarantee of the Tranche C debt. Tennenbaum declined. See 5/1/13 Hearing Tr. at 89. In no way does this show any collusion between Tennenbaum and Skadden. It shows just the opposite - that Tennenbaum and Skadden had an adversarial relationship.

35. Skadden did not wrongfully collude or conspire with Tennenbaum to orchestrate or manipulate these Chapter 11 cases and the sale process for the benefit of Tennenbaum at the expense of Debtors' creditors and equity interest holders, or Kennedy and his affiliates. Tennenbaum did not engage in misconduct, wrongful conduct, fraud, illegal conduct or a breach of fiduciary duty. 353 B.R. at 841; Sale Order at p. 7. Tennenbaum at all times acted in good faith with a view to maximizing Radnor's value to all constituents. 853 B.R. at 841. Tennenbaum never aided and abetted a breach of fiduciary duty. Id. at 843. Tennenbaum did not plan to acquire Debtors when it made its initial investment in Debtors, nor at any time thereafter. Id. at 829.

36. There was no collusion or conspiracy between Skadden and its affiliates on the one hand, and Tennenbaum or its affiliates on

the other in connection with any matter in these Chapter 11 cases. See, e.g., 5/1/13 Hearing Tr. at 64, 69, 88.

37.  Skadden was not, as Kennedy contends, "general counsel" to Tennenbaum or its funds.  5/1/13 Hearing Tr. at 116-117.

38.  Skadden did not represent Kennedy individually in connection with these Chapter 11 cases, and did not owe  attorney-client duties to Kennedy.  Skadden did not have any duty to advance Kennedy's personal bankruptcy objectives or preferred chapter 11 plan.  Kennedy has admitted that he was separately represented by his own personal counsel in connection with the Chapter 11 cases.

39.  Skadden did not independently, or in concert with Tennenbaum, prevent Kennedy from participating in these Chapter 11 cases.  5/1/13 Hearing Tr. at 90-91.

40.  Although Kennedy might have preferred an out of court restructuring or chapter 11 reorganization of Debtors, such a restructuring or reorganization was precluded by Debtors' circumstances and DIP financing terms.  See Sale Order at pp. 5-6.

41.  Prior to the Petition Date, Debtors actively marketed their assets, but were unable to consummate a sale or refinancing transaction outside the auspices of bankruptcy court protection (Sale Order at p. 5); the sale procedures approved by the Court were the result of intense arm's length negotiations among Debtors, the Committee, Tennenbaum and the DIP Lenders (id.); in the absence of court approval of the sale, Debtors' Chapter 11 cases ultimately

would have been a free-fall chapter 11, and Debtors would have been required to begin the piecemeal liquidation of Debtors' assets and businesses, which piecemeal litigation would result in less value for Debtors' creditor constituencies (id. at p. 6); emergent circumstances and sound business reasons existed for the sale (id.); the sale transactions were in the best interests of Debtors, their estates and creditors, and all parties in interest (id.); entry into the APA and consummation of the sale transactions were an exercise of sound business judgment by Debtors and in the best interests of Debtors, their estates and creditors, and all parties in interest (id. at pp. 6-7); the APA and sale transactions were negotiated and undertaken by Debtors and Tennenbaum at arms' length without collusion or fraud, and in good faith within the meaning of section 363(m) and (n) of the Code (id. at p. 7); Tennenbaum did not engage in any conduct that would cause or permit the APA or sale transactions to be avoided, or costs or damages imposed, under section 363(n) of the Code (id.); there was no evidence of insider influence, improper conduct, fraud or collusion by Tennenbaum or any of its affiliates in connection with the negotiation of the APA and the sale (id. at p. 10); approval of the APA and the sale transactions were in the best interests of Debtors, their creditors, their estates, and all parties in interest (id. at p. 14); the sale transactions were undertaken by Tennenbaum in good faith, and Tennenbaum was a purchaser in good faith within the

meaning of Code section 363(m) and entitled to all of the protections afforded by section 363(m) (id. at p. 15).

42. The bankruptcy sale process, deadlines and procedures contemplated by the APA were required by the terms of the Final DIP Order (Doc. # 278) authorizing debtor-in-possession financing and related adequate protection for Debtors' prepetition lenders. The terms of Debtors' debtor-in-possession financing and the Final DIP Order provided funding only for a chapter 11 sale and liquidation process, not a stand-alone restructuring (e.g. a debt-for-equity restructuring that Kennedy might have preferred). The Final DIP Order expressly provided that Debtors' failure to accept a qualified bid for their assets on or before November 20, 2006 would be an event of default. Doc. No. 278 at ¶ 13(a)(iv). The Final DIP Order's terms of adequate protection for Debtors' prepetition lenders required Debtors to adhere to deadlines for court approval of the sale process, and the procedures and deadlines contemplated by the APA. Id. at ¶ 19(f). The Final DIP Order provided that if Debtors did not adhere to the sale process and timely accept a qualified bid for their assets, then their prepetition lenders would be entitled to exercise their nonbankruptcy remedies. Id.

43. Following the Sale, Debtors proposed a liquidating chapter 11 plan. At a March 15, 2012 confirmation hearing, counsel for Kennedy asked orally for an adjournment of the hearing and an extension of his time to assert objections to confirmation of

Debtors' plan.   3/15/12 Hearing Tr. at pp. 8-9 (Doc. # 1950)
Kennedy's counsel asserted at the March 15 hearing that Kennedy
needed additional time to hire "special counsel" to get[]up to
speed" on certain matter Kennedy allegedly had "uncovered." Id. at
pp. 8-9.  In response, the Court set April 16, 2012 as an extended
deadline for Kennedy to file a renewed confirmation objection on
any and all grounds he might assert.  Id. at 21.

44.  Counsel for Debtors thereafter agreed to further extend,
ultimately for an additional three months until July 10, 2012,
Kennedy's time to file a confirmation objection.  Doc. # 1966,
Exhibits A-D.

45.  Despite the extensions of time granted to him by the
Court and Debtors and the nearly six years that had already
elapsed, Kennedy did not file a confirmation objection.  Instead,
on July 10, 2012, Kennedy filed a motion to further extend his time
to file a confirmation objection (the "Motion to Extend). (Doc. #
1964).

46.  On July 12, 2012, Tennenbaum and Debtors each filed
objections to Kennedy's Motion to Extend.  On July 15, 2012, the
Court denied Kennedy's Motion to Extend, and Kennedy was time-
barred from filing any objection to Debtors' plan of liquidation or
any other similar pleading in opposition to confirmation of
Debtors' plan in the above-captioned cases.

47.   On September 10, 2012, this Court entered an order (the "Confirmation Order")(Doc. # 1976) confirming the Modified Second Amended Joint Plan of Liquidation of Radnor Holdings Corporation and Its Affiliated Debtors and Debtors In Possession (the "Plan"). On September 28, 2012 (the "Effective Date"), the Plan became effective.

48.   In the Confirmation Order, this Court determined and specifically found and decreed, among other things, that: Debtors proposed the Plan in good faith and not by any means forbidden by law, and Debtors and their respective officers and directors acted in good faith in the negotiation and formulation of the Plan (Confirmation Order at pp. 17-18); Debtors and their respective officers, directors, employees, agents, counsel and other professionals acted in good faith in connection with the solicitation of acceptances of the Plan (id. at pp. 22-23); the provisions of the Plan shall bind any claimholder or interest holder, whether or not such holder has accepted the Plan (id. at pp. 25); all entities who held, hold or may hold claims against or interests in Debtors are permanently enjoined from taking any action that is inconsistent with the provisions of the Plan (id. at pp. 27-28); none of Debtors or their respective present or former attorneys shall have or incur any liability to any claimholder or interestholder for any postpetition act or omission in connection with, related to, or arising out of, Debtors' Chapter 11 cases, the

pursuit of confirmation of the Plan or consummation of the Plan, except for willful misconduct or gross negligence (id. at p. 28); and on the effective date of the Plan, the Old Equity Interests (as defined in the Plan) shall be canceled and each holder thereof (e.g., Kennedy) shall not be entitled to, and shall not receive or retain any property or interest in property on account of, such interests (id. at p. 32).

49.   On November 8, 2012 in accordance with the terms of the confirmed Plan, Skadden filed its Final Fee Application and set an objection deadline of December 26, 2012.   On December 26, 2012, Kennedy filed his Motion-Objection pro se. (Doc. # 1993)  With that pleading, Kennedy purported to object to Skadden's Final Fee Application and seek orders: "setting aside" the Sale Order over six years after it was entered; "revesting" in Debtors' estates the assets sold to the Purchaser (an affiliate of Tennenbaum) pursuant to the Sale Order; invalidating certain releases in the confirmed and consummated Plan; appointing an examiner, trustee and special counsel to conduct an investigation and bring certain causes of action at Kennedy's behest; and other unspecified relief.

50.   At all times during these Chapter 11 cases (i) Skadden acted in good faith as counsel to Debtors and (ii) did not hold or represent an interest adverse to Debtors' estates and was disinterested within the meaning of 11 U.S.C. § 327(a).

51.    Skadden's Pre-Retention Disclosures and other disclosures made in connection with Skadden's retention as bankruptcy counsel, including Skadden's disclosures with respect to Tennenbaum, were adequate and sufficient.

52.    Skadden did not engage in any malpractice, breach of fiduciary duty, fraud, conspiracy, perjury, obstruction of justice or other willful misconduct in connection with the above-captioned Chapter 11 cases.[2]

**NOW, THEREFORE, THE COURT CONCLUDES AND HEREBY ORDERS that:**

1.    The Kennedy Objection (Doc. # 1993) is **OVERRULED** in its entirety.

2.    The Final Fee Application (Doc. # 1989) is **GRANTED.**

3.    Debtors are authorized and directed to pay 100% of the fees requested in the Final Fee Application, in the amount of $3,934,254.50 and 100% of the expenses requested in the Final Fee Application, in the amount of $305,540.25 minus amounts previously paid.

---

[2]The sale transaction and the confirmed plan resulted in the elimination of Kennedy's equity interest in Radnor.  On information and belief, Tennenbaum has undertaken legal action against Kennedy by reason of Kennedy's guarantee on a portion of the debt owed by Radnor to Tennenbaum.